Thank you. We will begin with Alliance for the Wild Rockies v. Marten. Good morning. May it please the Court, my name is Rebecca Smith and I represent the Appellants' Alliance for the Wild Rockies et al. I would like to reserve three minutes for rebuttal if I could. That's fine. Thank you. And I would like I would like to start out today by addressing the grizzly bear biological opinion issue and more specifically, starting with the statutory requirements. And I want to start with the statutory requirements because I think that there has been a little bit of confusion about this Court's case law and what it has required, but all of the case law stems from what the statute actually says, which is... Can I ask you to do the other order? I mean, it seems to me the other issue is just inordinately more complex. Okay, Your Honor. I will start with that Wildland... I mean, or you can do the grizzly pig briefly, but I do think the other issue is a huge mess actually. Okay, Your Honor. I will start there then. I will start with that Wildland-Urban Interface issue. And to sort of clarify, unmuck the mess, I will also start with the relevant statute for that issue, which is the Healthy Forest Restoration Act statutory definition of Wildland-Urban Interface. And so, just quickly before I get to that part, as you know, we're talking about the Links Amendment to the Forest Plan, which says you can log if it's a Wildland-Urban Interface area. And so our argument here is... Now, in your complaint, in your objections, you said that the Links Amendment has a one mile circumference requirement, but that's not anywhere that I could find. So is that off the table? Yes, Your Honor. Okay. Let's go on. I'm glad that you raised that issue, because there have been various definitions through the years of what Wildland-Urban Interface is. But in the current statute, it's not there. No. Okay. So what we're looking at right now, starting with the statutory definition under the Healthy Forest Restoration Act, the definition of Wildland-Urban Interface, which says an area within or adjacent to an at-risk community that is identified in recommendations to the Secretary and a community wildfire protection plan. So that's the first step, is that we look to the at-risk community in the wildfire protection plan. At-risk community... We look to their community, their policy. To the Powell County Plan, yes. Right. Does that mean that they can say anything? No, Your Honor. What it means is it still has to be an at-risk community, and the Healthy Forest Restoration Act also does define at-risk community. In that same section 6511, but at subsection 1, it also defines at-risk community. And what it says in that definition is that it has to be either an interface community as defined in a specific Federal Register entry, or a group of homes. And so that is when we have to stop looking at the statute and look at the Federal Register citation, which was 66 Federal Register 753, which is also available on 2001 Westlaw 7425 at page 753. But you're not challenging anything about the Powell County Plan as being impermissible? No, not on appeal, Your Honor. We are just saying that when you have to have an at-risk community, the Powell County Plan did look at the at-risk community, and it was those four-mile concentric rings around those at-risk community. That's not what the Project EIS Map did. What the Project EIS Map did, and this is what I want to clarify, is it looked at an intermix community. So in the briefing, the government refers to that as over 28 people per square mile. But what the Powell County Plan actually looked at, and which nobody seems to have discussed at all, was some, they didn't appear to be using the half-mile or 1.5 miles. They were using this Silvis study, Stuart et al., and that is a completely different format. That's using housing density rather than people. And it, from what I could tell, they were using the half-mile. And I could tell, if you actually did it this way, you'd have about half the county covered. And no one's addressed this, because they didn't use the, they say national HFRAWI mapping has been compiled in part with funding by this Silvis study, and then they go on and they use that standard. So aren't we all in the wrong ballpark in terms of what this? Let me add to that and just ask, make it more complicated for you. What standard are you urging the court to adopt? Which of these? I mean, you don't like the government's, right? Well, the Powell County Plan, which is the four-mile buffers around the towns of Elliston and Rameeny. But it's not. I mean, I just read you what it is. It's not, it's four miles out from the edge of the HFRA defined WUI, and that's defined differently. If you look at, there is, if you look at the actual document, which is not in the record, then being just a concentric circle around the settlement. So Your Honor, they said in the Powell County Wildland-Urban Interface, they said that they were building on the national definition. And they say that the wildland... Different national definition, not the one that's in the statute. And so basically what they're saying, if we look at the statute, the definition, there's a Part A and a Part B. And the Part A says, basically, if there is a community wildfire plan, you apply the Wildland-Urban Interface that is in the community wildfire plan. If there is no community wildfire plan, you apply Part B. And Part B is where it says, areas that are half a mile from the boundary of an at-risk community, or areas that are one and a half miles from the boundary of an at-risk community, and contain certain key features such as steep slopes, et cetera. So what they basically did was take these towns and then add the one and a half or one mile, half a mile or one and a half mile... But I just explained to you that that isn't what they did. Because they weren't starting from the towns. They were starting from this different UI mapping in this document, which is not in the record. Which, as I understand, it wasn't wrapped around the towns. The same towns necessarily. Well that might be a reference to whether it's an interface community or not. And so if you are looking for the number of people per square mile, if you're looking at that definition of it, that's what's in the Federal Register. Okay, but it's not... Specifically in this plan it says housing density. And it's based on housing density and not on people. Your Honor, what page in the record are you... I am looking at ER 886 and 887. What it says is there's a Wildland Urban... Are you looking at something other than the Wildland Urban Interface Protection Buffer? I'm looking at... No, I'm looking at what's in before that. What they're buffering. They're not buffering the town. They're buffering an area that is in this extra record document that is based on housing density and not people per square mile. Well Your Honor, what this really brings up is that it's really unclear in the record how this happened. And to further add to that, I would say that it wasn't until we got these post hoc declarations from the government, which they have put in the record at SCR 1 through 12, where they sought to explain how they analyzed and mapped the Wildland Urban Interface for the project. What they say they did for the project, which seems to be very different than what you're saying, if we look at SCR 2, they say that what they did was take the regional R1 HFRA WUI layer, where they took anything with population density over 28 people per square mile, which again is the intermix population, not the interface population. So it's not an at-risk community. And then they added to that the data from the tri-county interface community WUI zones. That's at SCR 11. And so if we look at SCR 12, paragraph 7, they say this WUI layer was created joining two different WUI layers. One was a four-mile buffer of interface communities with population density over 250 people per square mile. The other was the Region 1 HFRA WUI layer based on the HFRA WUI definition, which they then say at SCR 2, paragraph 3, was mapped based on communities with population density over 28 people. And where are those maps? As I understand it, the Region 1 HFRA maps are just taking the statutory 0.5 and 1.5 miles and mapping it. That's not what it's doing because it's not looking at the interface communities. It's taking the intermix communities and adding them. What's the difference between interface and intermix? What is an intermix community? Okay, Your Honor, so this gets back to the definition. The statutory definition says that an at-risk community, that subpart 1, is an interface community. All right. What does that mean? That means a population density of over 250 people per square mile. Okay. And then that same Federal Register site also defines what an intermix community is, and that's the lower population numbers. Twenty-eight? Yes, to 250. And so we have to look at that Federal Register to know the difference between intermix and interface, and interface is at risk. You think that larger area that's in the map that isn't in the concentric circles is due to that? Intermix, yes. And, Your Honor, the support for that is SCR 2 at paragraph 3 where they say the metadata specifically explains that communities with population density over 28 people per square mile and roads were buffered by either one-half mile or one-and-a-half mile. So they were buffering intermix communities, which is not the definition of wild and urban interface. And this is confusing, and the reason it's... It's not the definition of that, or it's not the definitions in the Powell County CWPP? It's not the statutory definition which says that a wild and urban interface is an area identified near an at-risk community. Because the intermix ones don't count? Is that what you're saying? Because at-risk community is defined as interface community. Okay, at risk. So there must be more than just the number of people involved. There must be other criteria involved also, right? Because you're saying one is an at-risk community, the interface community, and one is not an at-risk community, it's an intermix community. Can you tell me more of the difference other than just the numbers? Your Honor, well, the difference is just that the statute makes a distinction. For some reason they made that distinction at that number of people. Over 280 people per square mile is interface and at-risk. Less than it is not. And all I can say is that if we look at the citation that they cite in the HFRA definition, is the citation to the Federal Register... Let's go back to the Powell County CWPP. Wildland Urban Interface, WUI. WUI is composed of both interface and intermix communities. In both interface and intermix communities, housing must meet or exceed a minimum destiny of one structure per 40 acres. So there's talking about a different world in here. That does appear to be saying interface and intermix. And it also says they're counting houses, not people. And nobody has said boo about this in the briefing. That's true, Your Honor, and I guess that is because when we looked at the... So in the EIS, this level of detail was not admitted. In these declarations that the Forest Service filed, SCR 1 through 12, they then gave this definition, which I'm presenting to the Court, which was based on the number of people... They seem to be using the tri-counting CWPP instead of the Powell County one. Yes. Yes, Your Honor, they did do that. All right. Do you want to talk about grizzly bears? Why don't you talk about them for a little while? Before you go to the grizzly bears, let me ask you something that, as a district judge, I can't help but raise at this point. You are arguing, and I have a feeling opposition will also argue, from matters that none of you had before this appeal, which means there is now new material in the record that really doesn't mesh with the arguments, what made you appeal in the first place. If I were seeing this situation for the first time at the district court level, I would send you guys out to talk to each other. I would say either directly or with a mediator, whichever you chose, but I would say you haven't really had a chance to sit down and compare apples and apples, because you've got a whole fruit salad here. I mean, and you haven't really addressed the questions that Judge Berzon has been asking you. They're not in your brief. This is not a question, okay? This is a suggestion that if it turns out that this case goes back, I strongly urge you to suggest both sides go to the district judge. Let me ask it a different way, because we have terrific mediators of our own. So why don't you think about, while we're talking to your opposing counsel, whether it makes sense for us to ask whether you want to talk to mediators and what your position would be on that. Which would be a totally different stage of the proceeding, but it just almost cries out for you guys to talk to each other. Okay. Yes. And we'll give you, talk about Grizzly Bears for, let's say, three minutes. Okay, Your Honor. I just wanted to reiterate on that issue that the statute does say, quote, the biological opinion shall include, and then, or excuse me, it says, quote, the secretary shall provide a written statement setting forth the secretary's opinion, and then it goes on to say, detailing how the agency action affects the species or its critical habitat. And that's at 1536, 16 U.S.C. 1536 B3A. And I just wanted to put that in the record, because it does say that it is the Fish and Wildlife Service's job, the secretary, to do the written statement that details how the agency action affects the species. Well, presumably, they could do it by saying, we agree with everything that was in the Forest Services assessment, see page of so-and-so and so-and-so. Well, Your Honor, that is not what this court held in Center for Biological Diversity versus BLM. In that case, this court found that where a Forest Service EIS and biological assessment had raised plausible effects that the Fish and Wildlife Service denied, that the Fish and Wildlife Service did indeed need to address those effects. And that's at 698 Fenster. That's a different point. In other words, if they're saying things didn't matter, which the Forest Service said didn't matter, then they have to address it. But they don't have to repeat what's in the Forest Service document, do they, as opposed to incorporating it, if they agree with it. If they are dismissive towards it, yes. And as this court held, that when the agencies disagree, quote, while the record certainly does not compel either conclusion, it does establish that this specific issue was a relevant factor that required discussion in the biological opinion. And so here, there was significant disagreement between the Forest Service and Fish and Wildlife Service about what type of effects this project, including thousands of acres. So they had to explain it. Yes. So they had to explain at least why. That's a different point than saying they couldn't allude to or incorporate or whatever to the degree they agreed with it. I have a question for you. What Fish and Wildlife says does, recommends or doesn't recommend, isn't it integrally bound up with what the project is? And don't we not know at this point what the project should be at this? Isn't that what we just discussed for about 15 minutes? I.e., if we reversed or did something in the first part, did we just skip the second part? If you were to remand for an analysis on the wildland-urban interface that could potentially change the project, then this would be a moot issue, yes, because they would have to consult on whatever the project was at the time. The new project. Yes. They'd have to do it over again for the new project. Yes. All right. And you'd have to decide whether you're even objecting. Yes. That's correct, Your Honor. Yes. And, Your Honor, I see my time has been long enough. Your time is up. I'll give you the other panel. Thank you very much. Thank you. Good morning. May it please the Court. I'm Summer Ingalls here from the Fish and Wildlife Service and the Forest Service, and we ask the Court to affirm. Are you going to clear up these mysteries? I don't understand. Yes. Nobody has looked at this as far as I can tell, this Powell County CWPP, as to what it actually says. I agree that there seems to be some discrepancy with reference to the Sylvis project. When the Forest Service reviewed the Powell County plan, which it was involved in developing, it interpreted references to the HFRA WUE to refer to the statute itself. That's wrong, as to what this plan says. I agree that there appears to be some tension there. I think the larger point here is that the wildland-urban interface referenced in the Sylvis project does appear to include much more of the project area than is mapped. That's probably true, and the plaintiffs may not like the answer you get if you look at this, but don't we have to do it right, as opposed to... They're using concentric circles from the towns, which doesn't seem to be what happened here. You're using, as far as I can tell, largely the Tri-County plan instead of this plan to figure out this superimposed map that you have, which has a whole lot of areas other than the concentric circles that seems to have been added in for some reason, and I don't know what it is. The Forest Service did apply the Powell County plan. The Forest Service interprets the Powell County... I just showed you that it didn't. I mean, it absolutely didn't. I respectfully disagree, and here's why. As we explained in our brief, the Powell County plan builds upon the definition, the HFRA definition. No, it doesn't. It says specifically that it's working off a housing density scheme, and that it's using both interfaced and intermixed communities, and it must meet or exceed a minimum density of one structure per 40 acres, and it's not saying anything about people. Yes. If the court is concerned, and I understand the court's concerned, that the WUI has been improperly mapped based on the Powell County definition, we'd ask the court to remand without vacater. First, because the Powell County definition here, with reference to the syllabus project, does appear to include much more of the project area than is set forth in the FEIS, and also because the map I've cited on page 13 of my brief, which is provided from the State of Montana and also referenced in Montana's amicus brief, reflects that much of the area south of the town of Elliston is included in the Powell County WUI. That map explains that the State of Montana applied the definition in the Powell County WUI, or the Powell County Community Wildfire Protection Plan, to generate that interfaced area. How did, on the map that you're trying to use, you have the concentric circles and then you have some more pink prop land. What's that? That area. You say it's not what the district judge said it was. It's not areas of high, of electric lines or roads. So what is it? That's correct. It buffers intermixed communities, which are a type of interfaced community, as described in the Federal Register, cited in. . . You mean other communities than Elliston? Is that the name of the town? Yes. Other than that, there's some other communities down there? That's correct. The town of Elliston is north of the project area.  So where does your version of the National HFRA map appear? Where is it? Is there some. . . The Region 1. . . Is there some document that has it all? The Region 1 WUI buffer is set forth. . . Well, the entire WUI for the project area is set forth on SER 204. I don't have a larger map that shows the WUI buffer throughout Region 1. The declarations in the excerpts of record do explain the mapping process for that, for generating the Region 1 wildland-urban interface. And I would add that they are properly part of the record on appeal because they were submitted with our district court summary judgment briefing. What's the they? I'm sorry. The maps, the maps that Alliance has argued are post hoc declarations. Can I interrupt a second? You were talking a little while ago about remand without vacateur. Yes. What does that mean? What would we. . . I understand what remand means, but I don't understand what the effect of with or without vacateur means. Can you explain that? Yes. Our request would be that the court send this back to the district court with instructions to send it back to the agency, allowing it to continue the project while generating a more detailed map that shows why much of the project area complies with the Powell County definition of the WUI. I'd add also that Powell County participated as an amicus. How can we do that if the. . . I understand, and you may well be right, that the net result of applying what's actually in this plan may end up with more land. But still, I don't understand how we can go ahead on a completely erroneous understanding of what Powell County did. I agree it's frustrating that the map does not clearly. . . Well, what's frustrating is that you didn't read the plan. That's what's frustrating. Well. . . I mean, nobody along the way has actually read this plan. So vacatur, as you're presenting it, the difference would be allowing whatever activity is going ahead in whatever section they're going ahead in to continue while the remand is in effect and so forth and so on. That's the difference? That's. . . And if it were with vacatur, that would stop everything in its place, right? Yes, that's correct. I just need to understand. Why? The ordinary remedy in an administrative review case is to vacate the decision if it was based on an error and not taking the proper standards into account. That's what happened here, it looks like. Why would we then let the plan go forward in the meanwhile? Two reasons. First is that, first, the Powell County plan, the court has identified, seems to apply much more broadly to the project area than the area identified in the maps in the record. Second, the state of Montana has provided a map that mapped the Powell County community wildfire protection area, and it clearly includes much more of the area than is identified in the Forest Services map. The other reason why vacatur is not appropriate here is because the on-the-ground conditions in this project area require prompt treatment. This area has been affected by a significant mountain pine beetle infestation. Ninety percent of the area, in fact, has been affected. Now, the trees that remain. . . I mean, where is this map, Montana map? I don't see any map in the Montana brief. I'm sorry? You say there's a map in the Montana brief. I don't see a map in the Montana brief. The map is cited.  I don't know if it should immediately pull up the PDF. You were saying 90 percent. . . I'm sorry. You were saying 90 percent of the forest. . . Is it dead? It's not entirely dead, but much of it is. The areas that are proposed for clear-cutting are largely dead. Areas that are not dead are diseased or are dying. And it's important for the Forest Service to promptly treat these areas because without prompt treatment, the areas are at risk of wildfire. Should a wildfire start, Forest Service personnel will be unable to get in on the ground because trees lying on the ground will block their entry and require entry by air. Should a fire start, it's also particularly dangerous, not only because communities are in this area, homes and structures could be affected, but also because the area just east of the project area is the 10-mile watershed, which is a crucial watershed for the City of Helena and the larger Helena Valley. So those factors counsel against completely vacating the project and allowing the project to proceed while the Forest Service generates a map that takes into account the Sylvis project. Okay, so let me ask you this. I believe a short while ago, Judge Berzon pointed out that there were mediation services available here at this court. Before the decision is made about vacatur or non-vacatur, I don't want to put you on the spot, but wouldn't it be more advisable if at least the parties could sit down and agree on some part of this that could go forward while the remapping is done? Because there is overlap. There definitely is overlap between the plans. It's a little hard to tell what's the right overlap and what isn't, but there is overlap. And surely as the project goes forward, I won't say surely, but isn't it likely that as the project goes forward, it could be agreed that while the remapping is done, X amount of the project could go forward and that plaintiffs might even not object to that? I'd be happy to enter into mediation. I would need to talk with my client about what would be able to go forward. But ultimately, the WUI area mapped by the Forest Service in the course of this project is larger than 16,000 acres, and of those, the Forest Service plans to treat only 2,565 acres. So I agree it's possible that project could proceed, ensuring that the agency is able to generate a proper map while also treating this area to respond to. Oh, do you want to talk about grizzly bears? I'd be happy to talk about grizzly bears. The ultimate purpose of formal consultation is to ensure that a federal project is not likely to jeopardize a listed species. It's not to discuss effects that have already been discussed in detail in the Forest Service's biological assessment. So here, the Forest Service created a detailed biological assessment that discussed the project's effects in detail, and the Fish and Wildlife Service analyzed those effects, discussed them in its biological opinion, and explained the basis for its determination that the project would not jeopardize listed species. Here, I think it's important to understand... Well, but the actual conclusion, leaving aside the access, was that it wouldn't result in adverse effects to grizzly bears. That's a different conclusion than the Forest Service's. Is that right? That's a different conclusion, yes. Right. So it doesn't have to explain a different conclusion? Ultimately, the purpose of a likely-to-adversely-affect determination made by the Forest Service is simply to tee the issue up for... Right. Well, if you look at it that way, it didn't do that either because it had a list of... The Forest Service assessment had a list of concerns, and the total answer to some of those concerns, I mean, with regard to the helicopters, for example, was a sentence. Helicopter use would be limited to prescribed burning activities and would not exceed 48 hours at any given time. Disturbance effects would be short-term and insignificant, period. That's the whole discussion. That's true. But the Fish and Wildlife Service is the agency responsible for coming to this determination, and the fact that it disagreed with the Forest Service reflects that the agency... But that doesn't look like any biological opinion you've ever seen before. It's true. It's a tiered... It's true, right? It's not tiered. As to the helicopters and the forage and the cover and so on, it's not tiered because what it was tiered to was only about roads and access. That's true. It's tiered in that sense, but the agency evaluated the other site-specific impacts. With a single paragraph that says nothing, essentially. It's a brief discussion but takes into account the fact that the agency has already studied grizzly bears in this region in detail. But it hasn't studied them with regard to three out of five of the issues that were raised by the Fire Service. And only in the opinions it tiered to, they only discussed roads and access, too. Right? I mean... Yes, that's true. The site-specific impacts, including changes to cover, linkage habitat, and helicopter use, are specific to this project. So they're not tiered to the 2014 and 2016... And they're discussed with... The effects of the proposed action on grizzly bear cover and forage would be insignificant. Period. Yes, it's short, but... It's not... It doesn't demonstrate any investigation or facts or anything. And that's why I say it doesn't look like any biological opinion I've ever seen. The part of the Fish and Wildlife Service analysis reflected the fact that this project takes place in a distribution zone and not a recovery zone. If it were in a recovery zone, it's possible that the agency would have discussed these factors in more detail. Can you explain what that means? I don't know what it means. Yes. A recovery zone is the primary area that's managed for grizzly bear recovery. It includes high-quality grizzly bear habitat and secure areas, core areas, that are separate from motorized access and include large chunks of undisturbed habitat. This project occurs in a distribution zone. This distribution zone is south of the Northern Continental Divide ecosystem. That's the recovery zone at issue. And the bears are in this area, this distribution zone, because they're doing quite well in the recovery zone. The population has grown at a rate of 3% each year since 2004. And in 2013, the agency determined that there were around 1,000 grizzly bears in the recovery zone. So they've traveled into the distribution zone because they're doing really well in the recovery zone. Now, that doesn't mean that the agency doesn't need to consider the possibility of jeopardy, but it does mean that the agency's analysis here reflected the fact that the grizzly bear population is doing well. The agency further explained that areas free from human disturbance would remain. The fact that treatments would occur in one drainage area at a time means that grizzly bears will be able to move throughout the landscape with only temporary effects. As for helicopter use... Yeah, go ahead. As for helicopter use, it will not exceed 48 hours at a time. The Forest Service explained in the second... What does that mean, 48 hours at a time? 48 hours, 48 hours, and now it's starting another 48 hours. I don't understand what 48 hours at a time means. It just means you can have lots of 48 hours. This use will be spread over a significant period. It will not be 48 hours back-to-back. Ultimately, the Forest Service predicts that if it uses helicopters to ignite prescribed burns at all, it'll likely be using them for only 2 to 4 hours at a time, and it will try to use preexisting roads to limit disturbance to grizzly bears. Do you realize how much more information you have just provided us in about 2 minutes than is contained in the report? Yes, I do. A lot of the information I provided is from the biological assessments, which the BIOP explains that it incorporates by reference. So the agency, the Fish and Wildlife Service, its ultimate purpose was to come to a jeopardy determination. What bothers me is that everything you say makes sense except that they disagreed with the biological assessment. So that seems to put a higher burden on. They could have said, yes, there is an adverse effect, but it's not going to jeopardize anything, and that would be one point, but that isn't what the conclusion is. The conclusion is that it's not going to have adverse effects. My best response is that the Forest Service was being careful here and reasonably brought these concerns to the Fish and Wildlife Service's attention, but ultimately the Fish and Wildlife Service is the agency responsible for evaluating the effects on the listed species. Okay, thank you very much. Thank you very much. You've been helpful. And I think you deserve a special commendation for grace under fire. Thank you. Okay, and we'll give you, I don't know how much time you have, but you can. There's two minutes showing on the clock, so let's do that. Okay. So it turns out there ends up being no dispute that the Forest Service did not use the Powell County Plan, and the declarations basically say they used the Tri-County Plan and this other layer, and I think that we're all in agreement here today that they didn't actually use the Powell County Plan. But she's probably right that there is this map that she is now referencing, which is the Montana map. Which was not created by Powell County. It's a state Montana department. I understand that. But whatever it is, I mean, you just need to deal with the fact that it's, I mean, in terms of what you want us to do going forward, that it is probably true, I can't prove it's true, that the actual plan is described as most of the project. Well, I did look at your citation, Your Honor, ER-886, and it does say that there needs to be one house per 40 acres with over 50% vegetation. And I don't know that that's in this area, because this area is mostly national forest. What is your suggestion as to how this goes forward? I think that we need to remand and have them map it specifically with their GIS people based on this specific map, definition of one house per 40 acres with over 50% vegetation. You're not challenging, because you have them to this point challenged, and I don't think you could do it now, whether they could do this, whether the plan can go to houses instead of people, even though the statute seems to be dealing with people, not houses. But you've never raised that question, and I don't think you can do it now. We did raise it in the district court, but then we did not raise it on appeal, so we're not arguing that here. And what about the with vacatur or without? Your Honor, that is the established practice is to vacate if there is a forest plan. Well, if the Forest Service has failed to demonstrate compliance with the forest plan provision, vacatur is the remedy, and that's at 907 Fed 3rd at 1121. And the reason that we need vacatur is because this court has said multiple times that we can't correct deficiencies in an EIS with a non-NEPA procedure, because we need to have public comment on this issue. We need to put the map out, have public comment on it, and then they can move forward with the project. That's Idaho Sporting Congress v. Alexander, 222 Fed 3rd at 567, and Great Basin Resource Watch, 844 Fed 3rd at 1104. Finally, do you have an objection to being essentially asked to talk to the mediators as to whether mediation is worthwhile? I mean, that's where we usually couch them. We don't say you must mediate. We say you must talk to them at least to determine whether there's any point in mediating. Yeah, that's fine, Your Honor. Thank you very much. Thank you. And I'll give you the same commendation. Thank you. Place under fire. Okay, Alliance for the Wild Rockies v. Martin is submitted, and we will go to Swanview Coalition v. Weber.
judges: Berzon, Watford, Rothstein